# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 22-0370V**

|  |  |
|---|---|
| WILLIAM ALVERSON, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: June 17, 2026 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Paul R. Brazil, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Jamica Marie Littles, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On March 31, 2022, William Alverson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine he received on October 20, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

Because the parties could not informally resolve the issue of entitlement, Petitioner filed a Motion for Ruling on the Record and a Brief in Support of Damages. For the

---

[1] Because this Ruling/Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

reasons set forth below, I find that Petitioner is entitled to compensation. In addition, I award Petitioner $100,000.00, in pain and suffering, and $428.07 for his past unreimbursable expenses.

## I.      Procedural History

This claim was initiated on March 31, 2022, and relevant medical records were filed thereafter. ECF No. 1-7. Although the parties attempted to informally resolve this case, they were unable to do so. Petitioner filed a Motion for Ruling on the Record and Brief in Support of Damages ("Mot.") on May 14, 2024. ECF No. 27. Respondent filed Response to Petitioner's Motion ("Opp.") on July 30, 2024, ECF No. 29. Petitioner did not file a Reply. This matter is now ripe for adjudication.

## II.      Relevant Medical History

A complete recitation of the facts can be found in the medical records, the Petition, declarations and affidavits, and in the parties' respective briefings. In summary, Mr. Alverson was a 64-year-old real estate agent when he received a flu vaccine in his left deltoid on October 20, 2020, at Publix Pharmacy located in Roswell, Georgia. Petitioner's Exhibit ("Ex.") 1 at 4; Ex. 2 at 60. At the time, his medical history was significant for De Quervain's tenosynovitis (inflammation of the thumb tendons), and he had experienced left wrist and arm pain since June 2020. *See* Ex. 2 at 59, 63-64.

Additionally, Mr. Alverson received a left thumb steroid injection, administered by his treating orthopedist, Rudolph Amadeus Mason, M.D., on August 7, 2020 (less than three months before the vaccination at issue). Ex. 2 at 126. However, at the time of his subsequent receipt of the flu vaccine, he had no documented history of left shoulder pain, injury, or dysfunction. Ex. 2 at 59.

On October 20, 2020, the day he received his flu shot, Mr. Alverson recalls that:

> [t]he pharmacy was especially busy and actually somewhat chaotic. Two pharmacy employees were working - one processed health insurance, and the other administered the vaccines. There was a long line. I was given my shot in the left arm. That afternoon, I experienced a good bit of discomfort and soreness in my upper arm. By early evening of the following day, I had considerable pain and stiffness in my shoulder and upper arm. The pain was sharp, burning and at times a dull ache. Over the following few days, I tried over the counter pain relievers and ice. Neither was very effective. I assumed that this was only a temporary side effect, and my symptoms would ultimately resolve soon.

2

*Id*.

On December 2, 2020 (43 days post-vaccination), Mr. Alverson emailed Dr. Mason's office to report ongoing left wrist pain and "quite severe pain in the spot where [he] received" his vaccination "in mid[-]October[.]" Ex. 3 at 1. Mr. Alverson added that he "[h]ad the flu shot in the same arm (left) having arm and wrist pain," and that his symptoms made it difficult to put on a shirt or jacket. *Id*. He requested an MRI of his left wrist and arm. *Id*.

The next day, Ellen Burgess – Clinical Athletic Trainer and Physician Extender from Dr. Mason's team - responded via email. Ex. 3 at 2. Ms. Burgess stated "[r]egarding the shoulder, you're actually not the first person we've seen with increased pain/stiffness after the flu shot. Let's get you started into some PT for that, as well as using the topical Voltaren on the area." Ex. 3 at 2. Petitioner's treatment plan included a physical therapy ("PT") referral, Voltaren gel prescription, and an MRI order. *Id*.

On December 16, 2020, Mr. Alverson saw his internist Sanjay L. Khant, M.D., for a routine annual exam and to renew his medications. Ex. 2 at 50-61. Petitioner reported "mild" left shoulder pain that began "after [a] flu shot." *Id*. at 59- 60. Dr. Khant diagnosed him with "[l]eft shoulder pain after [a] flu shot" and encouraged him to consult an orthopedist. *Id*. Dr. Khant also referred Petitioner to physical therapy ("PT"). *Id*.

One week later, on December 23, 2020, Mr. Alverson was seen for an initial PT consultation. Ex. 4 at 52-54. Petitioner reported 3-8/10 left shoulder pain that began "after a flu vaccine in October" as well as "soreness right afterwards" that had since improved. *Id*. He also reported occasional "stabbing pain over the deltoid" area, limited range of motion ("ROM"), and pain when sleeping on his left side. *Id*. On exam, Mr. Alverson demonstrated weakness and decreased ROM of his left shoulder, and his left arm was tender "over the deltoid and supraspinatus insertion." *Id.* at 53-54. The therapist recommended PT twice each week for eight weeks. *Id*.

From December 23, 2020, to January 19, 2021, Mr. Alverson completed eight PT sessions. He continued to report left shoulder pain and stiffness with movement, but he added that his arm functioned well overall. Ex. 4 at 38, 30, 42, 46, 48, 50, 52, 54.

On January 25, 2021, Mr. Alverson had a telehealth appointment with Dr. Mason for a left wrist follow up and left shoulder evaluation. Ex. 2 at 115. Petitioner stated that PT had provided him with no pain relief, but it improved his ROM "significantly" despite the persistent pain. *Id*. Dr. Mason's assessment was "possible adhesive capsulitis or

3

impingement" in the left shoulder, and he recommended a corticosteroid injection for pain relief. *Id*. at 118.

The next day (January 26, 2021), Mr. Alverson had a follow-up appointment in person with Dr. Mason that primarily focused on assessing his left wrist. Ex. 2 at 112-13. Petitioner's diagnosis list included adhesive capsulitis of the left shoulder. *Id*. at 113.

On January 29, 2021, Mr. Alverson returned to Dr. Mason's office and received a corticosteroid injection into his left shoulder joint. Ex. 2 at 107, 109-10. A few days later on February 2, 2021, Petitioner attended his ninth PT visit. Ex. 4 at 30. He reported relief following the cortisone injection. *Id*. Mr. Alverson told his therapist he was "uncomfortable with a full clinic with COVID so he will continue stretching at home…." *Id*.

Two weeks later, on February 11, 2021, Mr. Alverson saw a new orthopedic surgeon, Michael Brandon Gottschalk, M.D., regarding his left wrist. Ex. 2 at 104. Mr. Alverson also mentioned that his left shoulder pain had improved, but that he was still limited in his range of motion. *Id*.

On May 7, 2021, Mr. Alverson followed up with Dr. Mason. Ex. 2 at 100-03. Dr. Mason diagnosed Petitioner with adhesive capsulitis and administered a second cortisone injection. *Id*. Dr. Mason advised Petitioner to begin a home exercise program ("HEP"). *Id*. at 102-03.

On June 18, 2021, during an unrelated appointment with Dr. Mason for right knee pain, Mr. Alverson reported that his left shoulder had "somewhat improved" after his May 2021 steroid injection. Ex. 2 at 97.

Ten days later, on June 28, 2021, Mr. Alverson went to orthopedic surgeon Anthony C. Egger, M.D., for an additional opinion regarding his left shoulder. Ex. 2 at 93-96. Dr. Egger noted that Mr. Alverson had "initially tried to work through it on his own but then went to see Dr. Mason." *Id*. at 93. Petitioner reported having "soreness in his left shoulder shortly after receiving the flu vaccine in October." *Id*. at 93. He added that he desired a surgical consultation and stated that he hit a "plateau" in his pain relief after PT and two corticosteroid injections. *Id*. On exam, Petitioner had "mild" tenderness in his left shoulder with reduced ROM. *Id*. at 94-95. Dr. Egger diagnosed him with adhesive capsulitis and impingement syndrome of the left shoulder. *Id*. at 94-96.  Dr. Egger also recommended that Petitioner undergo a left shoulder manipulation under anesthesia ("MUA"), which Mr. Alverson had on July 20, 2021. *Id*. at 94-96; Ex. 2 at 134-35. The surgical notes state that when Mr. Alverson's arm was forced into flexion, there was audible tearing of the capsule that was felt and heard. Ex. 2 at 134-35. Petitioner resumed

PT the next day. From July 21 to 30, 2021, Mr. Alverson completed four post-surgical PT sessions. Ex. 4 at 24, 26, 30, 32.

On August 4, 2021 (two weeks after his MUA), Mr. Alverson saw Dr. John Xerogeanes, via telehealth, for a post-surgical follow-up assessment. Ex. 2 at 89-91. Petitioner reported that he was "doing much better since his procedure, [and he] noticed significant improvement in ROM and pain[.]" *Id*. However, Mr. Alverson also reported that despite completing his post-surgical PT, he still experienced pain whenever he fully extended his left arm and when reaching behind his back. *Id*. Petitioner subsequently completed four additional PT sessions. Ex. 4 at 14, 16, 18, 20.

By August 19, 2021, Mr. Alverson was discharged from PT, approximately 10 months post-vaccination. Ex. 4 at 14. Petitioner had met all his goals and was "independent in his HEP." *Id*. Although he still reported having slight pain at the end ranges of motion, he otherwise reported being "90% pain free" and exhibited "equal bilateral ROM[.]" *Id*. at 16-17.

In his sworn declaration, Mr. Alverson has stated that in late 2021 and early 2022, he experienced more significant improvements. Ex. 6 at 2. However, he stated that "[t]o this day, even though my symptoms have markedly improved, when extending my left arm in various positions, I can still feel stiffness. I still do not have 100% of the range of motion in my left arm that I had before the vaccine almost 3 years ago." *Id*.

Mr. Alverson also detailed in his declaration the extenuating circumstances during the time that he was experiencing his shoulder injury. He stated that,

[a]s a backdrop to this whole experience, other extenuating circumstances at the time added to my overall stress. This all began at the beginning of the COVID pandemic. Since my wife and I were over 60 years old, we were at high risk. Vaccines were not yet available. We were not eligible for the vaccine until March 2021. We were practicing every measure to be safe and limit our exposure. We had groceries delivered, wiped down our groceries before putting them up, did not socialize, and stayed at home.

In November 2020, my wife's oncologist told her that she needed to undergo major open abdominal surgery. She went in for surgery on December 9, 2020. When she came home, I was her only caregiver. I had a hard time taking care of her given the issues with my shoulder. We were not comfortable with having anyone in the house (family or friends) to help, since COVID was circulating and the vaccine was not available. This was a source of a lot of anxiety for me. I was very concerned about getting COVID and giving it to my wife. I knew it could have devastating

5

effects on her due to her compromised condition. Despite all this, I fought off my anxiety and continued to attend therapy, with hopes that I could recover and better take care of my wife and our home.

Ex. 6 at 2-3.

## III. <u>Applicable Law</u>

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

6

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## Analysis

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

7

time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### IV.    Factual Findings Regarding a Table SIRVA

Respondent has contested only one of the SIRVA elements in Mr. Alverson's case – onset. After a review of the entire record, and as set forth below, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied this, plus all other Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA.

*Pain Occurs with the Specified Timeframe (Onset)*

In order to meet the definition of a Table SIRVA, a petitioner must show that he experienced the onset of pain within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)) and § 100.3(c)(10)(ii) (QAI criteria)).

Respondent argues that Petitioner "failed to provide persuasive evidence that his left shoulder pain occurred within forty-eight hours of his October 20, 2020 flu vaccination. Rather, the actual onset is unknown, since Petitioner did not report his symptoms until December 2, 2020, over six-weeks post vaccination, and he did not present for actual care of his left shoulder until December 16, 2020, over two months after his October 2020 flu vaccination." Opp. at 7. Respondent further states that Mr. Alverson's first report of

8

shoulder pain was in an email to Dr. Mason's office, more than six weeks post-vaccination, where Petitioner "informed Dr. Mason's team that he already had pre-existing pain in his left wrist and left arm when he received his flu vaccination." *Id*. at 8.

Respondent also argues that Mr. Alverson made vague statements about the onset of his left shoulder pain, "reporting the pain occurred *since, after,* or *following* vaccination, without specifying a symptom start date or making contemporaneous statements that indicate his symptoms began within forty-eight hours of vaccination." Opp. at 7. It was only when Mr. Alverson retained an attorney that he became more specific about the onset of his left shoulder pain. *Id*. at 8. Respondent states that there are no contemporaneous medical records or other evidence to corroborate this claim, and therefore, any related unsubstantiated statements should carry little weight. *Id*.

Finally, Respondent argues that Mr. Alverson did not "provide a reasonable justification or medical explanation for why he failed to report his symptoms before December 2, 2020. Given that his initial report was via email, he could have emailed or called Dr. Mason about his symptoms within forty-eight hours of vaccination or shortly thereafter, despite any concerns related to the COVID-19 pandemic." Opp. at 9.

As a threshold matter, I note that six weeks is not a facially unreasonable time to wait before seeking treatment for shoulder pain thought to be potentially associated with vaccination. As I have stated in many other decisions and rulings discussing SIRVA injuries, petitioners often delay treatment because shoulder pain is a very common side effect of a vaccination, and expected to be transient. Many medical providers will counsel a patient to wait a period of time before being seen to allow the expected shoulder pain to subside. Thus, the treatment delay in this case is not worthy of significant weight in determining the disputed onset criterion.

In addition, although there is no requirement that a medical record specify the date of onset of symptoms, in this case there is a medical record with a more specific date range – and as the most contemporaneous medical record, it merits weight. Ex. 3 at 1 ("quite severe pain in the spot where [he] received" his vaccination "in mid[-]October[.]"). This is compelling evidence, which is well-supported by additional medical records and testimonial evidence. And the Vaccine Act allows special masters to make a variety of fact findings via the standard of preponderant evidence. *Roberson v. Sec'y of Health & Human Servs*., No. 21-2309V, 2025 WL 605724, at *7 (Fed. Cl. Spec. Mstr Jan. 24, 2025) (a specific onset date is not required; rather, a petitioner may demonstrate onset by preponderant evidence). Because onset may not be recorded, or may be recorded incorrectly, it can be determined by an overall weighing of the totality of evidence. Section13(b)(2).

Thus, on December 2, 2020 (46 days post vaccination, and the first time Petitioner was seen after vaccination), Mr. Alverson reported shoulder pain to his PCP, specifying that he had "quite severe pain in the spot where [he] received" his vaccination "in mid[-]October[.]" Ex. 3 at 1. While this statement does not exactly specify a 48-hour onset period, it does provide a specific range for the onset of Petitioner's shoulder pain. And as I have explained in other SIRVA decisions where onset has been contested, Respondent's characterization of the term "since" as impermissibly vague for purposes of onset determinations is not compelling. *See,* e.g., *Merwitz v. Sec'y of Health & Hum. Servs.,* No. 20-1141V, 2022 WL 17820768, at *3 (Fed. Cl. Spec. Mstr. Oct. 11, 2022). Instead, I have found that definitions for that term include the following, which support an immediate pain onset: 1) "from a definite past time until now" and 2) "from a particular time in the past until a later time." This is, therefore, not strong grounds for an adverse onset finding.

Regarding Respondent's argument that Mr. Alverson did not provide a reasonable justification or medical explanation for why he failed to report his symptoms before December 2, 2020, there is at least one notation in the record where Mr. Alverson told a physician that he initially attempted to treat the pain on his own. During his June 28, 2021, appointment with orthopedist Dr. Egger, Petitioner reported (and it is noted in the medical records) that Mr. Alverson had "initially tried to work through it on his own but then went to see Dr. Mason." Ex. 2 at 93. Thus, while this statement does not necessarily pinpoint a 48-hour onset of his shoulder pain, it does indicate why Mr. Alverson did not immediately seek medical treatment after vaccination.

I find these facts and statements by Petitioner to be credible and consistent with all his other reports that his shoulder pain began within 48 hours of receiving the vaccination. Thus, I find that Mr. Alverson has preponderantly met the 48-hour onset requirement.

### a. Other Requirements

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly in his left shoulder on October 20, 2020. Ex. 1 at 4; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for his injury. Petition at 5; Section 11(c)(1)(E) (lack of prior civil award). Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

10

The last criterion which must be satisfied by Petitioner involves the duration of his SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Starting from October 2, 2020 (24 hours after vaccination), the records undoubtedly demonstrate that Petitioner suffered the residual effects of his shoulder injury for more than six months. *See*, *e.g.*, Ex. 4 at 14 (August 19, 2021 discharge from physical therapy). Thus, this requirement is also met.

Based upon all of the above, Petitioner has established that he suffered a Table SIRVA. Additionally, he has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## V.    <u>Damages</u>

### a.  Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.  *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

11

A special master may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### b. Parties' Arguments

#### i. Petitioner

Mr. Alverson has requested $130,000.00 in pain and suffering. He argues that he reported his injury just six weeks after vaccination, and that his treatment consisted of visits to his primary care provider and orthopedist, a total of 19 sessions of PT sessions (11 PT pre-MUA and eight PT sessions post-MUA), two cortisone injections, treatment with Voltaren gel, and a manipulation under anesthesia. Mot. at 26-27. Mr. Alverson rated his pain from 8/10 initially which lowered to 3/10 with treatment and medication. Ex. 4 at 53-54.

Petitioner cites to five cases to support his requested award: (1) *Wilson v. Sec'y of Health & Human Servs.*, No. 19-0035V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr. March 18, 2021), (2) *Blanco v. Sec'y of Health & Human Servs.*, No. 18-1361, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. July 6, 2020), (3) *Vaccaro v. Sec'y of Health & Human Servs.*, No. 19-1883V, 2022 WL 662550 (Fed. Cl. Spec. Mstr. Feb. 2, 2022), *Moore v. Sec'y of Health & Human Servs.*, No. 19-1850V, 2022 WL 962524 (Fed. Cl. Spec. Mstr. Aug. 7, 2019), and *Kestner v. Sec'y of Health & Human Servs.*, No. 20-0025V, (Fed. Cl. Spec. Mstr. Feb. 3, 2023). Mr. Alverson adds that while his injury has markedly improved, he continues to have pain and discomfort when extending his left arm into various positions, and he can still feel stiffness. Ex. 6 at 2.

### c. Respondent

Respondent argues that Petitioner suffered a "mild-to-moderate" injury, and should therefore be awarded an amount consistent with cases with similar injuries. Opp. at 11-

12

12. In that respect, Respondent has argued that an award for pain in suffering in the amount of $60,000.00, is appropriate. *Id*.

Respondent notes that Petitioner's surgical treatment consisted of a MUA, which has previously been found to be a "less invasive surgical procedure than the arthroscopic surgeries that are common in the Vaccine Program." Opp. at 13. Thus, Petitioner should be awarded an amount less than the $130,000.00 sum demanded. Respondent notes that in all the cases Petitioner cited to support his proposed award for pain and suffering, those petitioners all underwent an arthroscopic surgery or any other open and invasive surgical intervention, "which is a distinct and 'less significant' procedure than an arthroscopic surgery. Therefore, this Court should give little weight to petitioner's cited decisions." Opp. at 18.

Because of these differences, Respondent argue that the cases cited by Petitioner are distinguishable, and Respondent cites to four other cases in support of his proposed award. *Randazzo v. Sec'y of Health & Human Servs.*, No. 18- 1513V, 2021 WL 829572 (Fed. Cl. Spec. Mstr. Feb. 1, 2021); *Bidlack v. Sec'y of Health & Human Servs.*, No. 20-0093V, 2023 WL 2885332, *7-8 (Fed. Cl. Spec. Mstr. Apr. 11, 2023); *Attig v. Sec'y of Health & Human Servs.*, No. 17-1029V, 2019 WL 1749405, at *1-2, *5-7 (Fed. Cl. Spec. Mstr. Feb. 19, 2019); *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906, at *2 (Fed. Cl. Spec. Mstr. May 23, 2018).

## III.    Appropriate Compensation in this SIRVA Case

### a.  Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times, Mr. Alverson was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of his injury. When performing this analysis, I review the same record relied upon to determine entitlement, including the filed affidavits and medical records, and written briefs. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases.

The record establishes that Mr. Alverson suffered a moderate SIRVA injury. His treatment course consisted of PCP and orthopedic visits, two cortisone injections, an MRI, 19 PT visits (11 pre-MUA and eight post-MUA), an MRI, and a surgical procedure (manipulation under anesthesia (MUA)). I also note that there was an approximate six-week initial delay in being seen for his injury. *See Shelton v. Sec'y of Health & Human Servs.*, No. 19-279V, 2021 WL 2550093, at *7 (Fed. Cl. Spec. Mstr. May 21, 2021) ("[t]he fact that petitioner could cope with her injury for such a long period of time counsels in

13

favor of a lower pain and suffering award. Treatment gaps are a relevant consideration in determining the degree of petitioner's pain and suffering"). Mr. Alverson's total treatment course was ten months (October 20, 2020, to August 19, 2021).

Petitioner cites five cases in support of his request for $135,000.00 in pain and suffering - *Wilson*, *Blanco, Vaccaro, Moore,* and *Kestner*. Petitioner argues that this case is "almost identical" to *Wilson*, where the petitioner first sought treatment 42 days after her flu shot, and participated in 5 PT sessions before undergoing anthropic surgery. Mot. at 8. The *Wilson* petitioner then completed another 13 PT sessions post-surgery, fully recovering from her surgery 11 months post-vaccination. *Id*. Petitioner noted that the primary difference was that the *Wilson* petitioner underwent arthroscopic surgery rather than a manipulation under anesthesia. Mot. at 10.  Petitioner argues that given the audible destruction of scar tissue during his MUA, and the recovery period, "the surgeries are likely not much different in effect." *Id*. However, a closer look at the *Wilson* case demonstrates that the petitioner had a much more invasive surgery.

The *Wilson* petitioner underwent a right shoulder arthroscopy with lysis and resection of adhesions, and extensive glenohumeral debridement. *Wilson*, 2021 WL 1530731, *3. The post-operative diagnoses included: 1) right frozen shoulder, 2) stiffness, right shoulder, 3) type 1 SLAP tear, right shoulder, 4) right rotator interval scarring, and 5) right biceps tendinitis/tenosynovitis. *Id*. While, in terms of invasiveness, it is one of the more minimally invasive arthroscopic procedures, it is still much more invasive than a MUA. The arthroscopic procedure requires surgical incisions to insert an arthroscopic camera to perform the surgery. Special micro-tools and motorized shavers are used to removal all debris, scar tissue, to clear the inflamed bursa and to smooth out any rough surfaces. With a MUA, while the patient is under anesthesia the surgeon carefully and forcefully moves the shoulder joint through various ranges of motion to release the stiff capsule. *See* Ex. 4 at 134-35. There are no incisions made and a patient, such as Mr. Alverson, is able to immediately begin post-surgical PT. *See* Ex. 4 at 24-32. Thus, an arthroscopic surgery, especially one where debridement is conducted, is clearly a more invasive procedure, distinguishing the present circumstances from some of Petitioner's cited comparable cases.

Respondent, on the other hand, cites two cases involving MUAs *(Randazzo* and *Bidlack*), and two cases with no surgical procedures at all (*Attig* and *Knauss*). Because *Attig* and *Knauss* do not involve any type of surgical procedures, I find them to be much less persuasive in determining an amount to award Mr. Alverson.

The main difference in the *Randazzo* case, where the petitioner was awarded $125,000.00 for her pain and suffering, is that the injured party underwent both a MUA and a subacromial decompression. *Randazzo,* 2021 WL 829572, at *7 (Fed. Cl. Feb. 1,

2021). Those details reflect more invasive treatment overall, diminishing the value of *Randazzo*.

I find that this case is most similar to *Bidlack*, where the petitioner underwent a MUA without any additional surgical interventions. *Bidlack*, 2023 WL 2885332, *7-8. In *Bidlack*, the petitioner called her doctor within 10 days of vaccination, although she waited a little over a month to seek treatment. *Id*. at *8. She had a break in treatment after her first visit of about four months, electing not to do physical therapy at that time. *Id*. Upon her return to treatment, she had five sessions of physical therapy and then underwent a MUA. *Id*. She completed an additional 15 post-surgical PT sessions and received two cortisone injections. She stopped treatment after 13 months. *Id*.

Like the *Bidlack* petitioner, Mr. Alverson reported his injury six weeks after vaccination, and his treatment consisted of visits to his primary care provider and orthopedist, a total of 19 sessions of PT sessions (11 PT pre-MUA and eight PT sessions post-MUA), two cortisone injections, treatment with Voltaren gel, and a manipulation under anesthesia. Mot. at 26-27. While the *Bidlack* petitioner had a slightly longer treatment period, Mr. Alverson's MUA did appear to show extensive adhesive capsulitis, and his affidavit sufficiently described how his injury affected his ability to care for his wife during the pandemic. Thus, although not identical, I find the *Bidlack* case to be a very persuasive comparison to Mr. Alverson's claim.

Under such circumstances, and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$100,000.00,** in compensation for Mr. Alverson's past pain and suffering is reasonable and appropriate in this case.

### b.  Past Unreimbursable Expenses

The parties have agreed that Petitioner has submitted preponderant evidence to support $336.15 in past out-of-pocket medical expenses related to his shoulder injury, and I shall award that amount. Opp. at 18. However, the parties disagree on the appropriate amount to reimburse Petitioner for milage as a "related travel expense" under Section 15(a)(1)(A) of the Act.

The sole difference in the amount the parties claim is due Petitioner for the mileage expense is a $5.60 charge, which Respondent states Petitioner has not provided documentation to support. *Id*. at 18. I agree with Respondent that without sufficient documentation to support this cost, the additional mileage will be denied. Thus, Petitioner is awarded a total of **$428.07** (i.e., $336.15 plus $91.92) for his unreimburseable expenses.

## CONCLUSION

Based on my consideration of the complete record as a whole and for the reasons discussed above, pursuant to Section 12(d)(3)(A), **I find that $100,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[4] Accordingly, I award Petitioner a lump sum payment of $100,428.07, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner**. This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[5]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[4] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.